* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim.
2. Plaintiff's average weekly wage was $550.00 per week, yielding a compensation rate of $366.68 per week.
3. The parties stipulated the following documentary evidence into the record at the hearing before the Deputy Commissioner:
 a. Stipulated Exhibit #1: Medical records
 b. Stipulated Exhibit #2: Medical bills
4. Subsequent to the Deputy Commissioner's hearing, the parties submitted additional records from Dr. Mallonee, which are hereby incorporated into the record as an Addendum to Stipulated Exhibit #1.
5. The issues before the Full Commission are whether plaintiff suffers hearing loss in both ears; and, if so, whether plaintiff's hearing loss is a result of harmful exposure to noise in the workplace; and, if so, whether plaintiff is entitled to any compensation.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 75 years old. From 1951 until 1993, plaintiff worked at the Ecusta plant. At the time of plaintiff's retirement in 1993, the Ecusta plant was owned by defendant-employer and plaintiff was an employee of defendant-employer. *Page 3 
2. Defendant-employer's plant is a paper mill. Plaintiff worked in the machine room the entire time he worked at the Ecusta plant. The work environment in the machine room was very noisy, and decibel readings in the room were consistently at least 90 dB and reached or exceeded 115 dB at times.
3. Defendant-employer provided hearing protection consisting of "lambs wool" (cotton balls) and foam earplugs, which was not readily available until the mid-1980's. Use of hearing protection was voluntary and not enforced. The high temperature and high humidity of the machine room caused the foam hearing protection to fall from plaintiff's ears and left him without any hearing protection on a regular and frequent basis.
4. Physical examinations of employees at the Ecusta plant were performed on an annual basis, and hearing tests were performed as part of the annual physical examinations. Larry Gregory, former relief supervisor in the machine room, testified that if an annual physical examination showed evidence of a hearing problem, the examiner would ask the employee if he wore earplugs. The employee would then respond "yes" and the examiner would suggest he continue to do so. If it was determined that hearing loss was severe, the examiner would recommend the employee see an ear specialist.
5. Plaintiff retired in 1993. There are no records of any examinations of defendant-employer's employees, and there is no evidence that plaintiff was ever recommended to present to an ear specialist. Plaintiff testified that he believed he suffered from some hearing loss when he retired in 1993; however, there is no medical evidence to show that he was diagnosed with bilateral hearing loss prior to August 1, 2002. Further, even if plaintiff was told he suffered from some hearing loss prior to his retirement in 1993, there is no evidence that company doctors causally related his condition to plaintiff's work environment or so informed plaintiff. *Page 4 
6. On August 1, 2002, plaintiff underwent a hearing test and audiogram performed by Mark Reynolds, a hearing aid expert with Beltone. This was the first time plaintiff received a hearing test and also, it was the first medical evaluation that allowed a medical provider to interpret the cause of plaintiff's hearing loss.
7. On May 25, 2006, plaintiff underwent an examination with Dr. Michael S. Mallonee of Charlotte Eye, Ear, Nose and Throat Associates. The examination revealed that plaintiff had a significant sensorineural hearing loss in the mid-and high-frequency range in both ears. The audiogram revealed that at 500 cycles per second, plaintiff's right ear was at 50 dB and his left ear was at 35 dB; at 1000 cycles per second, plaintiff's right ear was at 35 dB and his left ear was at 25 dB; at 2000 cycles per second, plaintiff's right ear was at 60 dB and his left ear was at 55 dB; and at 3000 cycles per second, plaintiff's right ear was at 60 dB and his left ear was at 75 dB. Based upon the 2006 audiogram, the parties stipulated that plaintiff suffered a 33.18% binaural hearing loss.
8. Dr. Mallonee testified that plaintiff's hearing in 2002 was better at every frequency than it was on May 25, 2006, due to the continued deterioration of the hearing nerves, bilaterally. Based upon the configuration of the audiometric studies, Dr. Mallonee testified to a reasonable degree of medical certainty that plaintiff's hearing loss was related to his prolonged noise exposure, and was not a congenital defect. Dr. Mallonee explained,
 Hearing loss, caused by loud noise exposure, occurs initially in the high frequencies. . . . Over time, if the environment in which they are exposed to loud noises has not changed — or hearing protection has not been given — then this will start to involve the mid-frequency range — which is where most of the speech frequencies are — and if, again, there hasn't been any change in the environment or there hasn't been any protection, will start to involve the lower frequencies over time. *Page 5 
Dr. Mallonee further testified that exposure to noise in excess of 90 dB and possibly in excess of 115 dB would result in continued hearing loss, even after plaintiff was removed from the noise exposure. Dr. Mallonee also stated that people who have hearing loss from diabetes generally do not have the same type of configuration, although diabetes can cause a deterioration of either congenital hearing loss or hearing loss resulting from loud noise exposure. Regarding plaintiff specifically, Dr. Mallonee testified that plaintiff's exposure to loud noises in excess of 90 dB for a period of decades was more likely a factor in plaintiff's continued worsening. Further, Dr. Mallonee felt that plaintiff requires a hearing aid for each ear for his bilateral hearing loss. The Full Commission finds that providing plaintiff with a hearing aid for each ear will materially improve plaintiff's ability to hear.
9. The Full Commission finds that plaintiff suffers from the occupational disease of hearing loss due to the prolonged exposure to extreme noise during the course of his employment with defendant-employer.
10. Plaintiff has incurred $2,130.00 in medical expenses relating to his hearing loss, of which $1,179.17 is still owed to Beltone.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The time limit for filing an occupational disease claim begins when an employee is diagnosed with an occupational disease and when the employee is informed of the diagnosis and its work-related nature.Terrell v. Terminix Services, 142 N.C. App. 305, 542 S.E.2d 332 (2001). In the present case, plaintiff was diagnosed with an occupational disease on August 1, *Page 6 
2002. Plaintiff filed his claim within two years of August 1, 2002; therefore, plaintiff's claim is not time barred. N.C. Gen. Stat. §97-58(b).
2. As a result of exposure from continuous noise greater than 90 dB during his years of employment with defendant-employer, plaintiff developed binaural hearing loss as demonstrated by both the August 1, 2002 and the May 25, 2006 audiogram. The May 25, 2006 audiogram demonstrates a compensable noise induced hearing loss of 33.18%, for which plaintiff is entitled to compensation for 49.78 weeks pursuant to the Addendum to Stipulated Exhibit #1, Occupational Hearing Loss Calculation Form. N.C. Gen. Stat. § 97-53(28)(g) and (h).
3. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable occupational disease, including hearing aids for both ears to materially improve his ability to hear, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. The approved medical expenses include payment of $1,179.17 to Beltone, for plaintiff's hearing aid. N.C. Gen. Stat. §§ 97-2(19); 97-25. N.C. Gen. Stat. § 97-53(28)(j).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendant shall pay plaintiff compensation at the rate of $366.68 per week for a total of 49.78 weeks. As said compensation as has accrued, it shall be paid in a lump sum. *Page 7 
2. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
3. Defendant shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his occupational disease, including hearing aids for both ears in accordance with the recommendations of Dr. Mallonee, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Defendant shall also remit $1,179.17 to Beltone for plaintiff's hearing aid.
4. Defendant shall pay the costs.
This 24th day of April, 2007.
 S/____________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________________ BUCK LATTIMORE CHAIRMAN
 S/____________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1